UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN BURKHARDT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>EXTRA SPACE MANAGEMENT, INC., a Utah Corporation, and DOES 1 to 50, inclusive<br><br>Defendants. | No. 2:25-cv-00547-DJC-CKD |
| JORDAN BURKHARDT, an individual, on behalf of himself and on behalf of all persons similarly situated<br><br>Plaintiff,<br><br>v.<br><br>EXTRA SPACE MANAGEMENT, INC., a Utah Corporation, and DOES 1 to 50, inclusive,<br><br>Defendants | No. 2:25-cv-00548-DJC-CKD<br><br>ORDER |

This Order addresses two related cases involving Plaintiff Jordan Burkhardt and his former employer, Defendant Extra Space Management, Inc.  Burkhardt alleges that

1

Extra Space Management, Inc. violated a number of labor and employment laws and engaged in disability discrimination against him while he was an employee.  He brings two separate actions seeking damages on an individual and class basis.  Extra Space Management, Inc., after removing the cases from state court, seeks to compel arbitration of specific claims while staying any claims not bound by the arbitration agreement, pending resolution of the arbitrable claims.  For the reasons discussed below, the Court finds that the Arbitration Agreement signed by the parties is valid and enforceable and GRANTS Defendant's Motions.

## BACKGROUND

Plaintiff Jordan Burkhart was employed as a property manager at Defendant Extra Space Management, Inc.'s ("Extra Space") Auburn Boulevard location in Sacramento County, California.  (ECF No. 1-4, Ex. A ¶¶ 2, 7.)[1]  Burkhardt is a citizen of California and Extra Space is a citizen of Utah.  (*Id.* ¶¶ 1, 3.)  As part of Burkhardt's employment, Extra Space provided him and his family housing at the facility he managed.  (ECF No. 11 at 1; *see* ECF No. 14 at 3.)  The parties agree that they signed an Arbitration Agreement ("Agreement") in October 2023, two years after Burkhardt became employed by Extra Space.  (ECF No. 7-1 at 3; ECF No. 11 at 1–2.)

In December 2023, while performing his role as property manager, Burkhardt sustained a serious injury to his back.  (ECF No. 1-4, Ex. A ¶ 9.)  That injury was exacerbated in January 2024, while Burkhardt was assisting with repairs around Extra Space's property.  (*Id.*)  Burkhardt filed a workers' compensation claim as a result of this injury.  (*Id.*)  In February 2024, after undergoing a Magnetic Resonance Imaging (MRI), Burkhardt was instructed not to lift anything that weighed more than ten pounds.  (*Id.* ¶ 11.)  He requested a reasonable accommodation from Extra Space's human resources department, which was not granted, and he continued managing

---

[1] This Order resolves two separate lawsuits filed by Burkhardt against Extra Space that emerge from a common set of facts: 2:25-cv-00547-DJC-CKD and 2:25-cv-00548-DJC-CKD.  Citations are to the briefing in 2:25-cv-00547-DJC-CKD unless otherwise specified.

the property without any assistance. (*Id.* ¶ 12.) In April 2024, Burkhardt inquired with Extra Space's district manager regarding how to take time off under the Family and Medical Leave Act or California Family Rights Act so that he could recover from his physical and emotional injuries. (*Id.* ¶ 13.) He also requested an additional reasonable accommodation of working at a different Extra Space location for a few days a week due to the anxiety and panic attacks he was experiencing at the Auburn Street location. (*Id.* ¶ 14.) Extra Space did not provide him with information about how to take leave under the statutes nor did it grant his new request for a reasonable accommodation. (*Id.* ¶¶ 14, 15.) On May 2, 2024, Burkhardt sent an email to Extra Space alleging that the company had improperly handled his workplace injuries, physical disability, and requests for accommodations. (*Id.* ¶ 15.) Extra Space terminated his employment four days later. (*Id.* ¶ 16.)

Across his two lawsuits, Burkhardt asserts sixteen causes of action against Extra Space. He brings the following causes of action in his first lawsuit: (1) Disability discrimination in violation of California Government Code section 12940(a); (2) Failure to engage in an interactive process regarding his requested reasonable accommodation in violation of California Government Code section 12940(n); (3) Failure to provide reasonable accommodation in violation of California Government Code section 12940(m); (4) Failure to take all reasonable steps to prevent discrimination in violation of California Government Code section 12940(k); (5) Retaliation in violation of the Fair Employment and Housing Act, California Government Code section 12940(h); (6) Retaliation in violation of CFRA, California government Code section 12945, *et seq.*; and (7) Wrongful termination in violation of public policy. (*Id.* ¶¶ 20–84.)

He brings the following causes of action in his second lawsuit, a class action complaint: (1) Unfair competition in violation of California Business and Professions Code section 17200, *et seq.*; (2) Failure to pay overtime wages in violation of California Labor Code sections 204, 510, 1194, and 1198; (3) Failure to pay minimum

3

wages in violation of California Labor Code sections 1194, 1197, and 1197.1; (4) Failure to provide required meal periods in violation of California Labor Code sections 226.7 and 512; (5) Failure to provide required rest periods in violation of California Labor Code sections 226.7 and 512; (6) Failure to provide accurate itemized statements in violation of California Labor Code section 226; (7) Failure to pay wages when due in violation of California Labor Code sections 201, 202, and 203; (8) Failure to indemnify or reimburse business expenses in violation of California Labor Code section 2802; and (9) Violation of the Private Attorneys General Act, Labor Code section 2698, *et seq.* (ECF No. 1-1 ¶¶ 35–110.[2]) Burkhardt brings his second complaint on behalf of a California class defined as all individuals who are or previously were employed by Extra Space in California and classified as non-exempt employees at any time during the period beginning on the date four years prior to the filing of the complaint and ending on a date as determined by the Court. (*Id.* ¶ 21.[3])

Extra Space removed both lawsuits from the Sacramento Superior Court to this Court. The first lawsuit was removed on the basis of diversity jurisdiction, and the second lawsuit was removed under the Class Action Fairness Act, neither of which were contested by Burkhardt. Extra Space now moves to compel arbitration of Burkhardt's individual claims, dismiss his class claims, and stay his non-individual PAGA claim.

## LEGAL STANDARD

The FAA governs arbitration agreements. 9 U.S.C. § 2. Under the FAA, a signatory to an arbitration agreement may obtain an order directing a noncomplying party to arbitrate in the manner provided for in the agreement. 9 U.S.C. § 4. In weighing a motion to compel arbitration, a court must determine: (1) Whether a valid agreement to arbitrate exists and, if it does; (2) Whether the agreement encompasses the dispute at issue. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir.

---

[2] This ECF citation is to Burkhardt's second lawsuit, 2:25-cv-00548-DJC-CKD.
[3] This ECF citation is to Burkhardt's second lawsuit, 2:25-cv-00548-DJC-CKD.

4

2016).  "Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).

"When considering a motion to compel arbitration, a court applies a standard similar to the summary judgment standard" of Federal Rule of Civil Procedure 56. *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citations omitted).  The party opposing arbitration receives the benefit of any reasonable doubts and the court draws reasonable inferences in that party's favor, and only when no genuine disputes of material fact surround the arbitration agreement's existence and applicability may the court compel arbitration.  *Id.*; see *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991).  The decision to compel arbitration is mandatory, not discretionary, if the requirements are met.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

## DISCUSSION

The crux of Burkhardt's argument is that the Arbitration Agreement he signed with Extra Space is procedurally and substantively unconscionable, especially following a recent California Court of Appeal case, *Cook v. University of Southern California*, 102 Cal. App. 5th 312 (2024), *reh'g denied* (June 13, 2024).  The Court concludes that *Cook* is distinguishable that the parties' Agreement is neither procedurally nor substantively unconscionable and accordingly GRANTS Defendant's Motions.

**A. The Arbitration Agreement is Valid and Encompasses the Dispute at Issue**

As an initial step, the Court must determine: (1) Whether a valid agreement to arbitrate exists and, if it does; (2) Whether the agreement encompasses the dispute at issue.  *Boardman*, 822 F.3d at 1017.

Here, the parties agree that they signed an Arbitration Agreement.  (*See* ECF No. 11 at 1–2; *see also* ECF No. 14 at 1.)  It appears that they also agree the Arbitration Agreement encompasses the dispute at issue.  (*See* ECF No. 11 at 1–2; *see also* ECF No. 14 at 1.)  The Court therefore finds that the Agreement is facially valid and

proceeds to an analysis of whether the Agreement is unconscionable.

**B. The Arbitration Agreement Signed by the Parties is not Unconscionable**

For a contract such as the Arbitration Agreement at issue here to be found unconscionable and therefore void, a reviewing court must determine that it is both procedurally and substantively unconscionable. "Procedural unconscionability 'addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power.'" *Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 492 (2024), quoting *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246 (2012). Contracts of adhesion – contracts imposed and drafted by the party of superior bargaining strength that relegates the subscribing party only the opportunity to adhere to the contract or reject it – are indicative of procedural unconscionability. *Yeng Sue Chow v. Levi Strauss & Co.*, 49 Cal. App. 3d 315, 325 (1975). Substantive unconscionability concerns the "fairness of an agreement's actual terms." *Pinnacle Museum Tower Assn.*, 55 Cal. 4th at 246. Contracts that are substantively unconscionable create unfair or one-sided results. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). While both procedural and substantive unconscionability are needed for a contract to be deemed unconscionable as a whole, these elements need not be present to the same degree. *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1243 (2016). Instead, Courts apply a sliding scale in which a contract with significant procedural unconscionability need not have significant substantive unconscionability, and vice versa. *Armendariz*, 24 Cal. 4th at 114.

Burkhardt argues that the Arbitration Agreement he signed is procedurally unconscionable because it is an "unusually oppressive adhesion contract due to the extreme inequality of the parties as not only employer and employee but also landlord and tenant" and because Burkhardt was not given a meaningfully opportunity to negotiate or reject it. (ECF No. 11 at 3–4.) He specifies that it is a contract of adhesion because he had no agency to reject or negotiate the Agreement

due to the employee/employer and tenant/landlord relationship he had with Extra Space. To illustrate this, Burkhardt emphasizes a clause in the Agreement that stipulates: "Your employment and/or continued employment with the Company shall be deemed acceptance of the Terms of Agreement. By accepting or continuing employment with the Company, you agree to the terms of this Agreement." (ECF No. 11 at 4; ECF No. 7-4 ("Yoachum Decl. Ex. A") at 2.) But Burkhardt selectively quotes from the Agreement. The Agreement also has an explicit "Opt-Out" section, which advises him that he has "thirty days after receiving this Agreement to opt out of arbitration . . . If you opt out, the decision to do so will not adversely affect your employment in any way." (Yoachum Decl. Ex. A at 4.) Burkhardt views the opt-out as being void, given that it conflicts with the earlier language that his continued employment signifies his acceptance of the Agreement.

Typically, the requirement than an agreement be signed as a condition for employment and housing would be indicative of a contract of adhesion and raise concerns about procedural unconscionability. But here, the Agreement stipulates that Burkhardt could withdraw and that this would not harm his employment with Extra Space. The Court acknowledges that these conflicting clauses are somewhat ambiguous as to whether Burkhardt could opt out of the Agreement. One interpretation is that the employment clause binds the parties to arbitration merely by Burkhardt's continued employment, which would indicate adhesiveness. A second (and in the Court's view, better) interpretation is that the employment clause controls *unless* Burkhardt opts out from the Agreement under the opt-out clause, which would not make the contract one of adhesion

The Court is required by binding case law to adopt the second interpretation. "Where a contract is susceptible to two interpretations, one which renders it valid and the other which renders it void, a court should select the interpretation that makes the contract valid." *Ramirez*, 15 Cal. 5th at 507. Because having an opt-out provision ameliorates any adhesive nature of the Agreement and presumably makes the

7

1 | contract valid, the Court must view that as the prevailing interpretation.  *See Circuit*
2 | *City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1200 (9th Cir.) (holding that a different
3 | agreement with a thirty-day opt out was valid).  The Court therefore finds that
4 | Burkhardt had the agency to reject the Agreement without consequence, as stipulated
5 | by the Agreement's explicit opt-out terms.
6 |       Burkhardt also argues that he did not have the opportunity to negotiate or
7 | refuse the terms of the Agreement because it was signed by Extra Space before he
8 | even received it.  (ECF No. 11 at 4–5.)  For this proposition, he relies on *Jenkins v.*
9 | *Dermatology Mgmt., LLC*, 107 Cal. App. 5th 633 (2024), which held that a different
10 | agreement that was pre-signed before being given to an employee was procedurally
11 | unconscionable.  The court in that case determined that the agreement was
12 | procedurally unconscionable because there was no opportunity for the employee to
13 | "modif[y] or refuse[]" the Agreement.  *Jenkins*, 107 Cal. App. 5th at 642.  But the
14 | *Jenkins* agreement is distinguishable.  That agreement did not have an opt-out
15 | provision, as did Burkhardt's.  *See generally*, 107 Cal. App. 5th 633.  Burkhardt, as
16 | discussed in the preceding paragraph, *did* have the explicit option to refuse the
17 | Agreement's binding arbitration clause, with no consequences for his employment
18 | (and presumably, his housing).  Burkhardt's decision not to opt out of the Agreement
19 | cannot later be relitigated as an issue of procedural unconscionability.  Finding the
20 | opt-out to be a valid option for Burkhardt, the Court concludes that the Agreement is
21 | not procedurally unconscionable.
22 |       Although the Court finds that the Agreement is not procedurally
23 | unconscionable, and therefore the Agreement cannot be unconscionable as a whole.
24 | it will address Burkhardt's argument that the Agreement is also substantively
25 | unconscionable due to the Agreement's Mass Arbitration and Bellwether Protocols
26 | clauses.  The relevant portion of the Agreement's Mass Arbitration and Bellwether
27 | Protocols clause is as follows:
28 | ////

9. Mass Arbitration and Bellwether Protocols.

a. . . . [I]n the event 25 or more arbitration demands of a similar nature are filed within 180 days of an arbitration demand filed on your behalf, and your claim or defense is presented by or with the assistance or involvement of the same law firm, organization, or collection of law firms as is involved in the other arbitrations of a similar nature, the Parties agree that this will constitute a "Mass Arbitration."

. . .

c. From the date of agreement that a Mass Arbitration has been filed, or if the arbitration provider determines that a Mass Arbitration has been filed, either Party may opt-out of arbitration within 30 days of the determination . . .

. . .

d. If the Parties proceed with the Mass Arbitration, they agree that the following terms and procedures shall apply: First, the Parties agree to the following bellwether protocols intended to reach a fair and speedy resolution of all claims in the Mass Arbitration. The arbitration provider shall randomly select four (4) demands for arbitration to proceed, and then claimants and respondents shall each select three (3) demands for arbitration to proceed, for a total of ten (10) arbitrations ( the Bellwether Arbitrations are adjudicated, all remaining demands for arbitration comprising the Mass Arbitration shall be held in abeyance and stayed, and no Party shall be responsible for paying any additional administration or arbitrator fees (other than initial filing/administrative fees) while the Bellwether Arbitrations are adjudicated. Any applicable statute of limitations regarding those demands shall be tolled beginning from the date of determination there is a Mass Arbitration. The Parties agree that these bellwether procedures are designed to achieve an overall faster, more efficient, and less costly mechanism for resolving Mass Arbitrations, including claims that are not selected for Bellwether Arbitrations. Accordingly, following the resolution of all of the Bellwether Arbitrations, the Parties shall engage in a global mediation of all remaining demands for arbitration comprising the Mass Arbitration. The mediation shall be administered by the arbitration provider, or a mutually agreeable other mediator.

e. If the Parties are unable to reach a global resolution following the above Bellwether Arbitrations and global mediation, the following batching provisions shall apply to the remaining claims:

i. The Parties shall cooperate to group the arbitration demands into randomized batches of no more than 100 demands per batch. To the extent there are fewer than 100 arbitration demands left over after the batching previously

9

        described, a final batch shall consist of the remaining demands.

        ii. provider in a format as directed by the arbitration provider.

        iii. The arbitration provider shall treat each batch of demands as one case, with each case having one demand for arbitration, one appointed arbitrator, and one set of administrative documents, and administrative, arbitrator, and filing fees per batch.

        iv. A separate arbitrator will be appointed to, and administrative and filing fees assessed for, each batch of demands.

        v. This batching process shall not impact the nature of these actions as individual in nature, including that the arbitrator will make a separate determination for each claimant, nor shall it change the burden of proof on each individual claimant.

(Yoachum Decl. Ex. A at 3–4.)

        Burkhardt argues that the Mass Arbitration and Bellwether Protocols clause contains "numerous problematic provisions," and more specifically, that it is asymmetrical in application and adds undue delay and costs to a plaintiff seeking to arbitrate. (ECF No. 11 at 8–10.) But he again selectively quotes the Agreement, again ignoring the fact that there is an express "opt out" provision in this clause. (*See* Yoachum Decl. Ex. A at 3.) Instead, Burkhardt focuses on the fact that, if the clause were to apply, a plaintiff's case could be held in abeyance and stayed for an indefinite amount of time, thereby depriving the plaintiff of any remedy. (ECF No. 11 at 10.) Next, he argues a plaintiff would be "required" to engage in forced global private mediation. (*Id.*) But he omits the fact that under the Agreement, he could simply opt out of either of the provisions and proceed directly to arbitration, should he desire. The substantive terms of the Agreement that Burkhardt finds offensive are not strictly binding given their express opt-out provision, and accordingly, the

Court does not find the Agreement to be substantively unconscionable.

Burkhardt relies on case law such as *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022) for this point, which held that a similar clause was substantively unconscionable. But the clause in *MacClelland* is distinguishable, as that clause did not have an express opt-out provision. *See generally*, 609 F. Supp. 3d 1024. Indeed, courts have found that when a similar clause *does* contain an opt-out provision, it is not unconscionable. *See McGrath v. DoorDash, Inc.*,19-CV-05279-EMC, 2020 WL 6526129, *10 (N.D. Cal. Nov. 5, 2020) (finding that a similar clause with a back end opt-out provision was valid).

The Court finds that the Agreement signed by the parties is not procedurally or substantively unconscionable, given that it expressly reserved the option for Burkhardt to initially opt out of its arbitration provisions with no consequences for him, in addition to preserving his ability to opt out of its mass arbitration and bellwether protocols later. The Agreement lacks both procedural and substantive unconscionability, both of which are needed to make the Agreement unconscionable as a whole. *See Baltazar*, 62 Cal. 4th at 1243.

**C. The Arbitration Agreement from *Cook* is Distinguishable**

Burkhardt separately points to *Cook v. University of Southern California*, a California Court of Appeal case from last year, for the proposition that the Arbitration Agreement he signed with Extra Space is substantively unconscionable. *See* 102 Cal. App. 5th 312. However, the Arbitration Agreement from *Cook* is distinguishable from the Arbitration Agreement in this case.

*Cook* involved an Agreement signed by the University of Southern California ("USC") and Cook, an employee. *Id.* at 316–17. That Agreement had three notable features: (1) A scope that included claims unrelated to Cook's employment; (2) A duration that extended beyond Cook's employment; and (3) A lack of mutuality

11

between Cook and those bound to the Agreement. *Id.* at 321–28. The Court of Appeal held that the combination of these factors rendered the Agreement substantively unconscionable. *Id.* The Court of Appeal also adopted the superior court's finding that the Agreement was procedurally unconscionable, which was not contested by the parties on appeal. *Id.* at 321.

Burkhardt seeks to analogize the Agreement he signed with the Agreement from *Cook*. (*See* ECF No. 11 at 5–8.) As an initial matter, there is no procedural unconscionability present in this case, distinguishing this case from *Cook*. Even putting that issue aside, however, the provisions found substantively unconscionable in *Cook* are distinguishable from the Agreement when the language is put in context. First, Burkhardt points to language in the *Cook* Agreement that covered the arbitration of "all claims, whether or not arising out of Employee's University employment, remuneration or termination, that Employee may have against the University or any of its related entities, *including but not limited to*" various named entities. *Cook*, 102 Cal. App. 5th at 321 (emphasis added). He analogizes that with his Agreement's language that the claims he must arbitrate "*include but are not limited to* all past, present, future disputes and claims related to or arising out of or in connection with your employment" and similar language stating, "the Agreement covers disputes and claims *including, but not limited to*, wrongful termination" and other employment-related topics. (*See* ECF No. 11 at 6–7; *see also* Yoachum Decl. Ex. A at 1 (emphasis added).) Burkhardt argues that the shared language of "including, but not limited to" in both Agreements is indicative that his Agreement's scope is substantively unconscionable, as in *Cook*.

Burkhardt's comparison is misplaced. The language of the Agreement in *Cook* contemplated covering claims wholly unrelated to the employment relationship between the parties. *See Cook*, 102 Cal. App. 5th at 321–22 ("The plain language of the agreement requires Cook to arbitrate claims that are unrelated to her employment with USC."). The *Cook* court, in finding this to be substantively unconscionable,

12

focused on the broad nature of this scope, which would presumably require the employee to give up her right to sue USC *in any other context*. *See id.* at 325. But while Burkhardt's Agreement does include similar open language ("including, but not limited to"), his Agreement clearly contemplates a narrower set of issues, fairly linked to his employment with Extra Space.

The list of topics that his Agreement links to possible claims being raised are all under the gamut of his employment. For example, his Agreement requires him to arbitrate "wrongful termination; discrimination; harassment; retaliation; breach of contract/covenant; trade secrets; emotional distress; fraud; misrepresentation; defamation; tort claims; minimum wage; off the clock work; overtime; bonuses; meal/rest periods; wage statements; reimbursement; [and] regulation." (ECF No. 11 at 6–7; Yoachum Decl. Ex. A at 7–8.) It also requires arbitration for claims raised under "Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Older Worker Benefit Protection Act, the Americans With Disabilities Act, the Rehabilitation Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, and any state, local or municipal whistleblower, human rights, labor and wage and hour laws." (ECF No. 11 at 6–7; Yoachum Decl. Ex. A at 1–2.) These enumerated lists of what must be arbitrated bely the parties' intent to require arbitration for employment-related actions; it is not explicitly broad in scope like the Agreement in *Cook*, which included more than just causes of actions stemming from the employment relationship. Burkhardt may not rely on similar phrasing to impute a broader scope of the Agreement while ignoring the context that the surrounding text provides. *See Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1210 (9th Cir. 2024) ("Contracts are interpreted as a whole so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.") (internal quotations omitted).

Second, Burkhardt errs by conflating the duration of the Agreement he signed with the Agreement from *Cook*. While he only dedicates three sentences to this

13

1 | analogy, Burkhardt compares the language in his Agreement that requires arbitration
2 | for claims that "include, but are not limited to all past, present, future disputes and
3 | claims . . ." (ECF No. 11 at 7; Yoachum Decl. Ex. A at 1–2.) Burkhardt argues that this
4 | language is indicative of an "unlimited future duration," lending itself to
5 | unconscionability. (ECF No. 11 at 7.) He points to language in the *Cook* Agreement,
6 | which dictated that the Agreement "shall survive the termination of Employee's
7 | employment, and may only be revoked or modified in a written document that
8 | expressly refers to the 'Agreement to Arbitrate Claims' and is signed by the President
9 | of the University." *Cook*, 102 Cal. App. 5th at 325. The *Cook* court deemed that
10 | language to be "indefinite" and a factor demonstrating substantive unconscionability.
11 | *Id.* at 325–26.

12 | But again, Burkhardt selectively quotes from his own Agreement. His
13 | Agreement specifies that it is "not limited to all past, present, future disputes and
14 | claims *arising out of or in connection with your employment with, application for*
15 | *employment with, or termination of employment with the Company* . . ." (Yoachum
16 | Decl. Ex. A at 1) (emphasis added.) That is, his Agreement does not apply indefinitely
17 | to all claims. It fairly implies, for example, that some employment-related claims, such
18 | as wrongful termination claims, can only apply in the future, and presumably seeks to
19 | cover those and similar actions.[4]

20 | Third, Burkhardt improperly compares the language in his Agreement and the
21 | agreement in *Cook* dictating the mutuality of its application to third parties. (ECF No.
22 | 11 at 7–8.) Yet again, Burkhardt selectively quotes from his Agreement. He points to
23 | language in his Agreement that specifies that he must arbitrate his claims against
24 | specific third parties, including "any of the Company's parents, subsidiaries, affiliates,
25 | as well as any of their respective officers, directors, current/former employees, agents,

---

[4] Further, Extra Space persuasively points out that because the Arbitration Agreement is limited to employment-related claims, there is no applicable indefinite end date, as those kinds of claims are governed by statutes of limitations, necessarily putting an end date on the Agreement's coverage. (*See* ECF No. 14 at 11–12.)

contractors, representatives, employee benefit plans and parties associated therewith, associates, owners, shareholders, successors, or assigns." (Yoachum Decl. Ex. A at 1.) He argues this text is analogous to the Agreement from *Cook*, which bound the employee to arbitrate her claims against USC and its related entities, but did not require those related entities to arbitrate their claims against the employee. *See Cook*, 102 Cal. App. 5th at 326. The *Cook* court found that the lack of mutuality in the Agreement – that it only required arbitration in one direction against third parties – was indicative of substantive unconscionability. *See id.*

But here, Burkhardt's Agreement specifically requires those same third parties to arbitrate their claims against him as well. His Agreement states: "This Agreement requires the Parties to mutually arbitrate all Claims, as defined in Section 3 below, the Parties may have against each other." (Yoachum Decl. Ex. A at 1.) It defines "Parties" as including entities that a part of the "Company Group," which includes "any of the Company's parents, subsidiaries, affiliates, as well as any of their respective officers" and so on. (*Id.*) In other words, Burkhardt's Agreement requires all entities linked to Extra Space to arbitrate their claims against each other. It does not have a carve out for specific entities, as did the *Cook* Agreement.

Considering these differences between the parties' Agreement and the Agreement in *Cook*, the Court finds that *Cook* is distinguishable and does not support a finding of substantive unconscionability in this case.

**D. Burkhardt Does Not Otherwise Contest that His Individual PAGA and Class PAGA Claims Must be Arbitrated**

On the issue of enforceability, Extra Space contends that: (1) The Agreement is enforceable under the Federal Arbitration Act; (2) Burkhardt's claims must be arbitrated on an individual basis; (3) Burkhardt's individual PAGA claim is subject to arbitration; (4) The parties never agreed to arbitrate non-individual PAGA claims; (5) Burkhardt's non-individual PAGA claims should be stayed pending arbitration; (6) federal and state law require a stay of the non-individual PAGA claim; (7) The

15

Agreement requires stay of the non-individual PAGA claim, and; (8) A stay of the non-individual PAGA claim pending arbitration promotes the interests of justice and judicial efficiency.  (ECF No. 17.[5])  Burkhardt does not acknowledge, respond to, or contest these arguments, and the Court views them as conceded.  (*See* ECF No. 20.[6])  Nevertheless, the text of the parties' Agreement, which the Court has found to be enforceable, dictates these results.  The Agreement signed by the parties binds Plaintiff to arbitrate all claims, including his PAGA claim, on an individual basis (Yoachhum Decl. Ex. A at 1–3), and does not bind the parties to arbitration over class PAGA claims (Yoachum Decl. Ex. A at 1–2).  Because the individual claim is subject to arbitration, the non-arbitrable PAGA class claims must be stayed pending the resolution of the arbitrable claims.  9 U.S.C. § 3; Cal. Code Civ. Proc. § 1281.4.

## CONCLUSION

Defendant's Motion to Compel Arbitration and Stay the Action (ECF No. 7 in case number 2:25-cv-00547-DJC-CKD) and Defendant's Motion to Compel Arbitration, Dismiss Class Claims, and Stay Non-Individual PAGA Claim (ECF No. 17 in case number 2:25-cv-00548-DJC-CKD) are GRANTED in full.  Burkhardt's class claims are dismissed and his non-arbitrable PAGA claims are STAYED pending the resolution of the individual arbitrable claims.

IT IS SO ORDERED.

Dated:  **July 30, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC5 – burkhardt25cv00547, burkhardt25cv00548.mtca

---

[5] This ECF citation is to Burkhardt's second lawsuit, 2:25-cv-00548-DJC-CKD.
[6] This ECF citation is to Burkhardt's second lawsuit, 2:25-cv-00548-DJC-CKD.